MAR 4 2024 AM11:59
FILED - USDC - BPT - CT

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF ELECTRONIC DEVICES SEIZED FROM GREGORY ABRUZZO AND THAT CURRENTLY ARE LOCATED IN THE EVDIENCE LOCKER OF THE CONNECTICUT DIVISION OF PAROLE AND COMMUNITY SERVICES, LOCATED AT 1052 NORTH AVENUE, BRIDGEPORT, CONNECTICUT | Case No. _3:24 mj 180(SDV)_ |

**AFFIDAVIT IN SUPPORT OF AN
APPLICATION UNDER RULE 41 FOR A
WARRANT TO SEARCH AND SEIZE**

I, Michael Oppenheim, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1.      I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the examination of property—two electronic devices—which are currently in law enforcement possession, and the extraction from that property of electronically stored information described in Attachment B.

2.      I am a Special Agent with the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF"), and have been since August 2001.  Since becoming a law enforcement officer, I have participated in hundreds of investigations of firearms violations and have conducted or participated in surveillances, the execution of search warrants, and the debriefing of informants and cooperating witnesses.  I have also examined firearms dealer records, inspected dealer premises, and investigated both licensed and unlicensed firearms dealers. Through training, education, and experience, I have become familiar with the documents and records, to

include electronic information, possessed by dealers and owners of firearms, and the manner in which individuals unlawfully possessing or dealing in firearms store, maintain, or use firearms.

3. As a law enforcement officer, I have utilized pen registers, geolocation data, Title III wiretaps, Social Media exploitation, and other investigative techniques related to cellular devices numerous times in the past while conducting and in furtherance of firearms and narcotics trafficking investigations.

4. As an ATF Digital Media Collection Specialist (DMCS), I have examined more than 200 digital devices, most of which were cellular telephones. In doing so, I have utilized multiple techniques to examine and/or extract data from devices in a forensically sound manner. In most instances, I have conducted a partial or thorough analysis of the extracted data.

5. This affidavit is intended to show only that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

6. Based on the facts set forth in this affidavit, there is probable cause to believe that violations of Title 18, United States Code, Section 922(a)(1)(A) (unlawful manufacturing or trafficking of firearms); Title 18, United States Code, Section 922(g)(1) (felon in possession of firearms or ammunition) and Title 18, United States Code, Section 922(g)(3) (unlawful user of a controlled substance in possession of firearms or ammunition) (collectively, "the Target Offenses") have been committed by Gregory ABRUZZO and others unknown. There is also probable cause to believe that located in the property described in Attachments A1 and A2, there will be evidence, instrumentalities, or fruits of these crimes, and will lead to the identification of individuals who are engaged in the commission of these offenses, to include ABRUZZO'S suppliers and customers.

2

## IDENTIFICATION OF THE DEVICES TO BE EXAMINED

7.      The property to be searched is the following, which were seized by the Monroe Police Department and then a Connecticut Parole Officer from a vehicle used by of Gregory ABRUZZO on February 20, 2024, and February 21, 2024, pursuant to a Statement of Understanding and Agreement – Conditions of Parole, which Abruzzo executed on November 28, 2023.  This document required that ABRUZZO submit to a search of any and all of his belongings at any time with or without cause:

    a)  One Apple, model MTQU3LL/A (iPhone 15 Pro), serial number: DCVVDH2YXL (the TARGET TELEPHONE)

    b)  One HP Laptop computer, seral number: 5CD312KW07 (the TARGET COMPUTER)

8.      The Devices are currently located at the Connecticut Division of Parole and Community Services, 1052 North Ave, Bridgeport, CT, Connecticut.

9.      The applied-for warrant would authorize the forensic examination of the Devices for the purpose of identifying electronically stored data particularly described in Attachments B1 and B2.

## PROBABLE CAUSE

10.      On February 22, 2024, I was advised by Connecticut Parole Officer Jack Wallace that Gregory ABRUZZO (born 1981), whom Officer Wallace supervises, had recently been arrested after police contact due to him having overdosed.  Officer Wallace explained to me that, late on February 20, 2024, Joseph Abruzzo called the police to 66 Laurel Drive, Monroe for his son, who was sitting, unresponsive, in the driver's seat of ABRUZZO'S black Ford truck.  While

being treated for what was determined to be a narcotics overdose, ABRUZZO advised first responders of a gunshot wound to his leg.

11.     Based on the gunshot wound, blood splattered all over the interior of the vehicle, and the obvious use of narcotics, Monroe Police Officers looked around the cab of the truck. Officers observed needles, drug paraphernalia, suspected heroin, two fully loaded 17-round Glock 9mm magazines, a full box of 9mm ammunition, and a holster for a Glock firearm still in its package.  At that point, officers seized the magazines and ammunition, discontinued searching the vehicle and had it towed to the Monroe Police Department.

12.     ABRUZZO advised officers that he had been shot a few days prior in Philadelphia, Pennsylvania.   Joseph Abruzzo advised officers that ABRUZZO travels to Philadelphia to purchase narcotics, having just returned from a trip there for a few days.

13.     Officers from Monroe learned that ABRUZZO was under Parole supervision and contacted Officer Wallace and advised him of the incident, that they had ABRUZZO'S vehicle at the police department, and that they had located two loaded magazines within it.

14.     Officer Wallace went to the hospital and spoke with ABRUZZO, who admitted to overdosing.  He told Officer Wallace that he had been shot while attempting to purchase drugs in Philadelphia on February 13, 2024.   Ultimately, ABRUZZO provided Officer Wallace with inconsistent information about both when he was shot, when and if he possessed a firearm, and where besides Philadelphia he had travelled.  Officer Wallace later advised me that he believed ABRUZZO was lying to him about most aspects of the prior few days.

15.     Officer Wallace then went to the Monroe Police Department to search ABRUZZO'S vehicle.  Officer Wallace has the ability and right under the Parole conditions of release, to inspect, search, or otherwise examine essentially anything related to the offender that

would allow Parole Officers to assess the offender's compliance with the conditions of his or her release. Officer Wallace indicated that he routinely inspects or attempts to inspect his offenders' residences, vehicles, and electronic devices, most frequently cellular telephones, during his compliance checks. All offenders on parole sign and execute the conditions of release form referenced above, stating "I will submit to a search of my person, possessions, vehicle, residence, business, or other area under my control at any time, announced or unannounced, with or without cause by parole or its agents to verify my compliance with the conditions of my parole."

16.     From within the vehicle, Officer Wallace observed that it contained a large number of needles and had a lot of blood within the interior. He also located a Bass Pro Shop / Cabela's receipt, from the Cabela's in Hamburg, Pennsylvania, dated February 17, 2024, with purchased items that included two Glock magazines, two boxes of 9mm ammunition, and a holster. In addition to the two loaded Glock magazines and the two boxes of ammunition (which match the items listed on the receipt) previously observed by officers from Monroe, Officer Wallace located one spent 9mm shell casing, an iPhone in a clear case (the TARGET TELEPHONE), an HP laptop computer (the TARGET COMPUTER), and a 3-D printer. Ultimately, the Monroe Police Department seized narcotics paraphernalia, the magazines, the ammunition, and some other items, while Officer Wallace took custody of the TARGET TELEPHONE and the TARGET COMPUTER. ABRUZZO was charged, via warrant, in state court with Unlawful Possession of Large Capacity Magazines and Criminal Possession of Ammunition.

17.     Based on his authority to search parolee's devices, Officer Wallace examined the contents of the TARGET TELEPHONE. From within, he observed a photograph, which was date-stamped February 17, 2024, of a Privately Made Firearm (PMF) with a Glock, model 45,

9mm slide, perched upon a loaded Glock magazine.  The PMF also appears to have a magazine within the firearm.  Officer Wallace also observed that the photograph was taken from within the cab of ABRUZZO'S Ford truck.   Officer Wallace also located an iMessage conversation between ABRUZZO and his father which included ABRUZZO messaging his father the above-referenced photograph of the PMF and a second angle of the same on February 17, 2024, at approximately 11:19 a.m.  Officer Wallace also located a conversation between ABRUZZO and his father from late January 2024, wherein he asked his father "You need and high Capacity[sic] mags? Down here in Philly and am getting some myself today."  He followed this up with "Like maybe for one of your HKs or something."  I know from my training and experience, that by messaging "Philly," ABRUZZO was referring to Philadelphia, Pennsylvania.  I also know that, unlike Connecticut and some other nearby states, which prohibit the sale or purchase of high-capacity magazines, Pennsylvania has no such restrictions, and anyone can purchase high-capacity magazines within that state.   Pennsylvania does not regulate the sales of firearms magazines as Connecticut does, and therefore, anyone can purchase them in Pennsylvania.

18.     I also know that when ABRUZZO messaged "HK," he was referring to Heckler & Koch firearms, which apparently are owned by his father.  His father, who declined the offer, also questioned ABRRUZO about why he was back in Philadelphia.  He responded "I didn't come for the usual.  I wanted to try out magazines and try out some different guns at the range. You can rent whatever you want.  This is the closest place I can do this."

19.     Officer Wallace also observed conversations wherein ABRUZZO appears to be setting up purchases of narcotics.  This included a conversation dating back to at least December 15, 2023, with "Jay/Q."   Through at least January 1, 2024, ABRUZZO asked "Jay/Q" for

$100.00 worth of crack ("100 hard") on four occasions, two of which also included a request for heroin ("a bun").

20.     As to the images of the PMF captured within the TARGET TELEPHONE, Officer Wallace observed that the grip area contained a logo which includes the characters "PY2A."   I know from my training and experience with PMFs, that this logo is part of downloadable 3-D printer plans for firearms frames and parts offered by PrintYour2A.com, the "2A" apparently being a reference to the 2nd Amendment to the U.S. Constitution.  I therefore believe that the firearm pictured within the TARGET TELEPHONE that Parole Officer Wallace viewed is a 3-D printed PMF fitted with a Glock slide.  As a 3-D printer was seized from within ABRUZZO'S vehicle, I believe that it is likely that ABRUZZO himself built the pictured PMF.

21.     I know from my training and experience, which includes investigations of PMFs generally, and 3-D printed PMFs specifically, that, in nearly every case, a traditional computer, such as the TARGET COMPUTER, is required to download files compatible with a 3-D printer, and that these files are then used by the printer either by use of a memory card transferred from the computer, or connected via a data cable directly to the computer.

22.     I know from my training and experience as an ATF Special Agent as well as an ATF Digital Media Collection Specialist that ATF has the forensic capability to examine files, downloads, search history, website cookies, additional browser data, and other artifacts from within a computer that could show if the user of the computer had accessed websites offering 3-D printer plans, downloaded any plans, and if those plans were copied to removable media suitable for use in a 3-D printer, or were directly sent to a 3-D printer.

23.     From the various records provided to me by Officer Wallace, both from the Connecticut Division of Parole and Community Services and the Pennsylvania Department of

Corrections, Parole Board, I learned that on or about September 1, 2022, ABRUZZO was sentenced to 1 – 2 years incarceration and three years of probation for violating Pennsylvania Statutes Title 18 Section 6106(a)(1) – Firearm Carried without a License, a 3rd Degree felony, which is punishable by a maximum sentence of incarceration of not more than seven years.  The records from Pennsylvania indicate that ABBRUZO signed his Parole Board Conditions Governing Parole/Reparole, which include his express consent to searches without a warrant, to his person property or residence, on November 22, 2023.  He also agreed to a special condition that he ". . . shall not possess ammunition or drug paraphernalia under any condition or for any reason."  ABRUZZO was released from custody onto parole supervision on November 23, 2023.

**TECHNICAL TERMS**

24.     Based on my training and experience, I use the following technical terms to convey the following meanings:

    a.  Wireless telephone:  A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals.  These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones.  A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone.  In addition to enabling voice communications, wireless telephones offer a broad range of capabilities.  These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing

dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet.  Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

b. Digital camera:  A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film.  Digital cameras use a variety of fixed and removable storage media to store their recorded images.  Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader.  Removable storage media include various types of flash memory cards or miniature hard drives.  Most digital cameras also include a screen for viewing the stored images.  This storage media can contain any digital data, including data unrelated to photographs or videos.

c. Portable media player:  A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files.  However, a portable media player can also store other digital data.  Some portable media players can use removable storage media.  Removable storage media include various types of flash memory cards or miniature hard drives.  This removable storage media can also store any digital data.  Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

d.  GPS:  A GPS navigation device uses the Global Positioning System to display its current location.  It often contains records the locations where it has been.  Some GPS navigation devices can give a user driving or walking directions to another location.  These devices can contain records of the addresses or locations involved in such navigation.  The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth.  Each satellite contains an extremely accurate clock.  Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers.  These signals are sent by radio, using specifications that are publicly available.  A GPS antenna on Earth can receive those signals.  When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

e.  PDA:  A personal digital assistant, or PDA, is a handheld electronic device used for storing data (such as names, addresses, appointments or notes) and utilizing computer programs.  Some PDAs also function as wireless communication devices and are used to access the Internet and send and receive e-mail.  PDAs usually include a memory card or other removable storage media for storing data and a keyboard and/or touch screen for entering data.  Removable storage media include various types of flash memory cards or miniature hard drives.  This removable storage media can store any digital data.  Most PDAs run computer software, giving them many of the same capabilities as personal computers.  For example, PDA users can work with word-processing documents, spreadsheets,

10

and presentations.  PDAs may also include global positioning system ("GPS") technology for determining the location of the device.

f.   Tablet:  A tablet is a mobile computer, typically larger than a phone yet smaller than a notebook, that is primarily operated by touching the screen.  Tablets function as wireless communication devices and can be used to access the Internet through cellular networks, 802.11 "wi-fi" networks, or otherwise.  Tablets typically contain programs called apps, which, like programs on a personal computer, perform different functions and save data associated with those functions.  Apps can, for example, permit accessing the Web, sending and receiving e-mail, and participating in Internet social networks.

g.   IP Address: An Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet.  An IP address is a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178).  Every computer attached to the Internet computer must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination.  Most Internet service providers control a range of IP addresses.  Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

h.   Internet: The Internet is a global network of computers and other electronic devices that communicate with each other.  Due to the structure of the Internet, connections between devices on the Internet often cross state and international

borders, even when the devices communicating with each other are in the same state.

25.     Based on my training, experience, and research, I know that the TARGET TELEPHONE has capabilities that allow it to serve as a wireless telephone, digital camera, portable media player, GPS navigation device, and PDA.   I also know that the TARGET COMPUTER has capabilities that allow it to serve as a digital camera, access the internet, and store and transfer files.  In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

26.     Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time.  Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device.  This information can sometimes be recovered with forensics tools. Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

27.     There is probable cause to believe that things that were once stored on the TARGET COMPUTER may still be stored there, for at least the following reasons:

   a.  Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet. Electronic files downloaded to a storage medium can be stored for years at little or no cost.  Even when files have been deleted, they can be recovered months or years later using forensic tools.  This is so because when a person "deletes" a file

on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

b.  Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten.  In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

c.  Wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how a computer has been used, what it has been used for, and who has used it.  To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files.  Computer users typically do not erase or delete this evidence, because special software is typically required for that task.  However, it is technically possible to delete this information.

d.  Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

28.  *Forensic evidence.*  As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how

13

the Device was used, the purpose of its use, who used it, and when.  There is probable cause to believe that this forensic electronic evidence might be on the TARGET COMPUTER because:

 a. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active.  Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords.  Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created.

 b. Forensic evidence on a device can also indicate who has used or controlled the device.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

 c. A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

d.  The process of identifying the exact electronically stored information on a storage medium that is necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators.  Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves.  Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e.  Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

29.  *Nature of examination.*  Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the Devices consistent with the warrant.  The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the Devices to human inspection in order to determine whether it is evidence described by the warrant.

30.  *Manner of execution.*  Because this warrant seeks only permission to examine devices already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises.  Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

## CONCLUSION

31.     I submit that this affidavit supports probable cause for a search warrant authorizing the examination of the Devices described in Attachment A1 & A2 to seek the items described in Attachment B1 & B2.  Because ABRUZZO had provided voluntarily Connecticut Parole with the right to search his cellphone since November 23, 2023, and because Connecticut Parole has referred the case to the ATF, I believe that a search warrant dated back to that date is reasonable in temporal scope

Respectfully submitted,

_____

MICHAEL OPPENHEIM
SPECIAL AGENT
BUREAU OF ALCOHOL, TOBACCO, FIREARMS AND EXPLOSIVES

Subscribed and sworn to before me

on March 4, 2024:

_____

THE HONORABLE S. DAVE VATTI
UNITED STATES MAGISTRATE JUDGE

16

**ATTACHMENT A-1**

The property to be searched is the following, which were seized by the Monroe Police Department and then a Connecticut Parole Officer from a vehicle used by of Gregory ABRUZZO on February 20, 2024, and February 21, 2024, pursuant to a Statement of Understanding and Agreement – Conditions of Parole, which Abruzzo executed on November 28, 2023.  This document required that ABRUZZO submit to a search of any and all of his belongings at any time with or without cause:

A.    One    Apple,    model    MTQU3LL/A    (iPhone    15    Pro),    serial    number: DCVVDH2YXL (the TARGET TELEPHONE)

One HP Laptop computer, seral number: 5CD312KW07 (the TARGET COMPUTER)

The Devices are currently located at the Connecticut Division of Parole and Community Services, 1052 North Ave, Bridgeport, CT, Connecticut.

This warrant authorizes the forensic examination of the Device for the purpose of identifying the electronically stored information described in Attachment B-1.

## ATTACHMENT A-2

The property to be searched is the following, which were seized by the Monroe Police Department and then a Connecticut Parole Officer from a vehicle used by of Gregory ABRUZZO on February 20, 2024, and February 21, 2024, pursuant to a Statement of Understanding and Agreement – Conditions of Parole, which Abruzzo executed on November 28, 2023.  This document required that ABRUZZO submit to a search of any and all of his belongings at any time with or without cause:

> One Apple, model MTQU3LL/A (iPhone 15 Pro), serial number: DCVVDH2YXL (the TARGET TELEPHONE)

One HP Laptop computer, seral number: 5CD312KW07 (the TARGET COMPUTER)

The Devices are currently located at the Connecticut Division of Parole and Community Services, 1052 North Ave, Bridgeport, CT, Connecticut.

This warrant authorizes the forensic examination of the Device for the purpose of identifying the electronically stored information described in Attachment B-2

**ATTACHMENT B-1**

1.      All records on the Device described in Attachment A-1 that relate to violations of 18 USC 922(a)(1)(A); 922(g)(1) and 922(g)(3) and involve Gregory ABRUUZZO from November 23, 2023, until the date of seizure, including:

     a.   the telephone number, ESN number, serial number, and SIM card number, or any other unique identifying numbers;

     b.   the numbers, digits, stored messages (voice and/or text), letters, symbols, data, information, and images stored in the memory;

     c.   descriptions of times, dates, locations, items, or events showing or tending to show the commission of, or connecting or tending to connect a person to, the above-described crimes;

     d.   all records, however created or stored, which demonstrate ownership and use of the device;

     e.   all records providing identification bearing the name or photograph of any person, telephone-books, address books, date books, calendars, personal files, notes, memos, and photographs of persons contained in the device;

     f.   any evidence showing the identity of the maker or user of the data and information contained in the device, such as passwords, sign-on codes, and program design;

     g.   GPS coordinates, waypoints, destinations, addresses, and location search parameters associated with GPS navigation software;

     h.   saved searches, locations, and route history in the memory of said devices;

     i.   internet browsing history, to include, internet searches in the memory of said device; and

     j.   images and videos in the memory of said device; and

    k. Any conversations on applications downloaded onto the device, including social media and text message applications, including but not limited to iMessage, Facebook messenger, Snapchat, and other similar social media platforms.

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.

II.    It is specifically authorized that stored electronic information, data, information and images seized may be reproduced by printing, converting, or copying into storage in another device, by converting said stored electronic information, or by copying said stored electronic information into storage in another device.

III.    It is specifically authorized that the warrant will be deemed executed once the seized items are extracted from the phone and that further analysis of the seized items extracted from the phone is permitted at any time thereafter.

3

## <u>ATTACHMENT B-2</u>

1.      All records on the Device described in Attachment A-2 that relate to violations of 18

USC 922(a)(1)(A); 922(g)(1) and 922(g)(3) and involve Gregory ABRUUZZO from November

23, 2023, until the date of seizure, including:

      a.  all records, however created or stored, which demonstrate ownership and use of the device;

      b.  all records providing identification bearing the name or photograph of any person, telephone-books, address books, date books, calendars, personal files, notes, memos, and photographs of persons contained in the device;

      c.  any evidence showing the identity of the maker or user of the data and information contained in the device, such as passwords, sign-on codes, and program design;

      d.  all records related to firearms, ammunition, parts, accessories, or Privately Made Firearms kits.

      e.  all records, files, images, instructions related to the use of a 3-D printer.